**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


| | | |
|---|---|---|
| TERESA C. MAINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11CV260 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Teresa C. Maines, brought this action via Section 205(g) of the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying an award of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act. The Court has before it the certified administrative record (cited herein as "Tr. __") and the parties have filed cross-motions for judgment (Docket Entries 10, 15). For the reasons that follow, the Court should enter judgment for Defendant.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, alleging a disability onset date of March 15, 2006. (Tr. 122-30.) Upon denial of the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, resulting in her substitution as Defendant, pursuant to Federal Rule of Civil Procedure 25(d).

applications initially (Tr. 65-66, 69-73) and on reconsideration (Tr. 67-68, 76-84), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 86). Plaintiff, her attorney, and a vocational expert ("VE") appeared at the hearing. (Tr. 26-64.) The ALJ ruled Plaintiff not disabled under the Act. (Tr. 10-25.) The Appeals Council denied Plaintiff's request for review, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review. (Tr. 1-3.)

In rendering that disability ruling, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2011.

2. [Plaintiff] has not engaged in substantial gainful activity since March 15, 2006, the alleged onset date (20 CFR 404.1571 et seq. And 416.071 et seq.).

. . .

3. [Plaintiff] has the following severe impairments: degenerative disk disease of the lumbar spine, sciatica, osteoarthritis of the right knee, asthma, status post-left knee replacement (2001), and obesity (20 CFR 404.1520(c) and 416.920(c)).

. . .

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

. . .

5. . . . [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR

404.1567(a), except she requires work which allows for the option to sit or stand at will, specifically the option every 20-30 minutes to stand a few minutes before resuming seated position. In addition, she should avoid hazardous environments such as hazardous climbing and exposure to dangerous moving equipment; she should avoid exposure to excessive amounts of dust, fumes, smoke, and industrial irritants; and her ability to do postural activities such as climbing stairs, stooping, kneeling, and bending are to be no more than on an occasional basis.

(Tr. 15-16.)

Given that residual functional capacity ("RFC") and the VE's testimony, the ALJ concluded Plaintiff could not return to her past relevant work, but that a significant number of jobs existed in the national economy that Plaintiff could perform. (Tr. 23-24.) Accordingly, the ALJ decided that Plaintiff had not suffered a "disability," under the Act, at any time from the alleged onset date through the date of decision. (Tr. 24.)

## DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached

through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and

was reached based upon a correct application of the relevant law."
Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In confronting that issue, the Court must note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Hall, 658 F.2d at 264. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess

<hr>

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-

whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## Assignments of Error

Plaintiff first argues that the ALJ erred (at step two) by failing to label venous insufficiency as a severe impairment and

---

related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

(in the formulation of the RFC and thus the resolution of step five) by failing to impose restrictions due to that impairment. (Docket Entry 11 at 4-5.) Further, Plaintiff asserts (again, in connection with the RFC and step five ruling) that the ALJ improperly evaluated Plaintiff's symptom reporting and the medical record, including the opinions of two treating physicians. (Id. at 6-10.) Defendant contends otherwise and urges that substantial evidence supports the ALJ's decision. (Docket Entry 16 at 3-20.)

## 1. Venous Insufficiency

According to Plaintiff, the ALJ should have identified venous insufficiency (and resultant edema and cramping in the lower extremities) as a severe impairment at step two. (Docket Entry 11 at 4-5.) Plaintiff further maintains that the ALJ failed to consider venous insufficiency in determining the RFC. (Id.) As to these matters, Plaintiff's brief states that "she must lie down and prop her feet up for most of the day to alleviate the pain and collection of fluid in her legs." (Id. at 4 (citing Tr. 35, 42).)[6] It additionally notes that Dr. Gwyn Bolling directed Plaintiff to "keep her feet elevated" (id. at 5 (citing Tr. 266)) and that Dr. Jennifer Logan limited Plaintiff to no more than 15 minutes of

---

[6] Plaintiff's brief also declares that her "leg pain and swelling were the main reasons she stopped working." (Docket Entry 11 at 4 (citing Tr. 39).) That declaration represents, at best, an overstatement, in that asthma symptoms apparently caused Plaintiff to leave her long-time job as a furniture sprayer/assembler (see Tr. 31, 40, 221-222, 225-26, 235-41, 267-88) and lower back pain and lower extremity swelling apparently led to Plaintiff ending a period of brief employment at a meat processing facility (see Tr. 39, 40, 185, 266).

walking at a time (<u>id.</u> (citing Tr. 320, 331-34)). Plaintiff has shown no reversible error on point.

An impairment qualifies as "not severe" if it constitutes only "a slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities." <u>Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe</u> ("SSR 96-3p"), 1996 WL 374181, at *1. Applicable regulations further provide that "basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> (2) Capacities for seeing, hearing, and speaking;

> (3) Understanding, carrying out, and remembering simple instructions;

> (4) Use of judgment;

> (5) Responding appropriately to supervision, co-workers and usual work situations; and

> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b) & 416.921(b).

Plaintiff bears the burden of showing severity. <u>See</u> <u>Hunter</u>, 993 F.2d at 35 ("Through the fourth step, the burden of production and proof is on the claimant."). Courts generally consider restrictions in one of the above-quoted areas due to an impairment as evidencing the requisite severity, unless such restrictions remain obviously slight, insignificant, or meaningless. <u>See</u> <u>Martin</u>

v. Heckler, 748 F.2d 1027, 1032 (5th Cir. 1984). Plaintiff, however, must prove severity with medical evidence:

> A claimant's showing at step two that he or she has a severe impairment has been described as "de minimis." Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997); see Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988)("de minimis showing of medical severity"). A claimant need only be able to show at this level that the impairment would have more than a minimal effect on his or her ability to do basic work activities. Williams, 844 F.2d at 751. However, the claimant must show more than the mere presence of a condition or ailment. If the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, the impairments do not prevent the claimant from engaging in substantial work activity. Thus, at step two, the ALJ looks at the claimant's impairment or combination of impairments only and determines the impact the impairment would have on his or her ability to work. Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).

> The determination at step two is based on medical factors alone. Williamson v. Barnhart, 350 F.3d 1097, 1100 (10th Cir. 2003). A claimant must provide medical evidence that he or she had an impairment and how severe it was during the time the claimant alleges they were disabled. 20 C.F.R. § 404.1512(c). The evidence that a claimant has an impairment must come from acceptable medical sources including licensed physicians or psychologists. 20 C.F.R. § 404.1513(a). A claimant's statements regarding the severity of an impairment is [sic] not sufficient. Adame v. Apfel, 2000 WL 422341 at *3-4 (D. Kan. March 20, 2000); Flint v. Sullivan, 743 F. Supp. 777, 782 (D. Kan. 1990).

Rivas v. Barnhart, No. 05-1266 MLB, 2006 WL 4046153, at *4 (D. Kan. Aug. 16, 2006) (unpublished).

The record did not require the ALJ to find that Plaintiff met that burden as to venous insufficiency. Although the record contains examples of Plaintiff's self-reported symptoms of venous

insufficiency, such as cramping (see, e.g., Tr. 52, 266, 315, 338), swelling (see, e.g., Tr. 34, 39, 46, 48, 49-50, 185, 199), numbness (see, e.g. Tr. 185, 261, 337), and pain (see, e.g., Tr. 50, 261), "[t]he determination at step two is based on medical factors alone." Rivas, 2006 WL 4046153, at *4 (emphasis added). The medical evidence in this case did not rise to such a level as to compel the ALJ to label venous insufficiency a severe impairment.

On November 17, 2006, after Plaintiff spent extended time on her feet during a brief period of employment at a meat processing facility, Dr. Bolling diagnosed venous insufficiency and lower extremity swelling. (Tr. 266.) However, the record contains no further diagnoses of venous insufficiency and only sporadic medical findings of lower extremity swelling (see Tr. 262, 315, 320). Notably, at an examination with Dr. L. Howard Nabors on February 25, 2007, Plaintiff made no complaint of lower extremity swelling and Dr. Nabors neither noted such on examination nor diagnosed venous insufficiency. (Tr. 242-44.)[7] Substantial evidence thus

_____

[7] Plaintiff's brief cites Dr. Nabors's above-referenced report as part of the record material purportedly documenting "numerous doctors' visits," that "confirmed" the existence of "[s]welling in [Plaintiff's] legs . . . in addition to cramping pains and numbness." (Docket Entry 11 at 4 (citing, inter alia, Tr. 242-44).) That report, however, makes no mention of any such swelling, cramping, or numbness. (See Tr. 242-44.) Other treatment records included by Plaintiff's counsel in the same citation sentence (see Docket Entry 11 at 4 (citing, inter alia, Tr. 273, 278)) similarly do not verify the presence of "[s]welling in [Plaintiff's] legs . . . in addition to cramping pains and numbness" (id.), but instead merely note "edema" (i.e., swelling) only in the "ENT" (i.e., ear, nose, and throat) section of those report(s), in connection with Plaintiff's complaint(s) of coughing (Tr. 273, 278). The undersigned Magistrate Judge will assume for now that these errant citations to the record simply represent honest mistakes by counsel for Plaintiff, rather than any intentional effort by her to

11

supports the ALJ's omission of venous insufficiency and related lower extremity swelling from the list of severe impairments.

Even if the ALJ had erred in that regard, any such error does not warrant remand in this instance. Where an ALJ already has found one severe impairment, a failure to include others generally cannot provide grounds for relief, because, "upon determining that a claimant has one severe impairment, the [ALJ] must continue with the remaining steps in his disability evaluation." <u>Maziarz v. Secretary of Health & Human Servs.</u>, 837 F.2d 240, 244 (6th Cir. 1987); <u>accord</u> <u>Oldham v. Astrue</u>, 509 F.3d 1254, 1256-57 (10th Cir. 2007); <u>Lewis v. Astrue</u>, 498 F.3d 909, 911 (9th Cir. 2007); <u>Lauver v. Astrue</u>, No. 2:08CV87, 2010 WL 1404767, at *4 (N.D.W. Va. Mar. 31, 2010) (unpublished); <u>Washington v. Astrue</u>, 698 F. Supp. 2d 562, 579 (D.S.C. 2010); <u>Jones v. Astrue</u>, No. 5:07CV452FL, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23, 2009) (unpublished). In this case, the ALJ found six severe impairments at step two and properly proceeded through the remaining steps. (Tr. 15-25.)

Moreover, during that further progression through the SEP, the ALJ expressly noted Dr. Logan's limitation on Plaintiff's ability

---

mislead the Court; however, particularly given the willingness of Plaintiff's counsel to ascribe malicious intent to others (<u>see, e.g.</u>, Docket Entry 11 at 7 ("[T]he ALJ blatantly mischaracterized [Plaintiff's] treatment history in an attempt to detract from her credibility. This is not the analytical method of an impartial adjudicator."), she should take greater care, <u>see generally</u> <u>Douglas v. California</u>, 372 U.S. 353, 360 (1963) (Clark, J., dissenting) ("There is an old adage which my good Mother used to quote to me, i.e., 'People who live in glass houses had best not throw stones.'").

to walk due to lower extremity symptoms, but gave Dr. Logan's restrictions "little evidentiary weight." (Tr. 22.) As discussed in more depth below, substantial evidence supports the ALJ's decision to discount Dr. Logan's opinion. Further, although the ALJ did not specifically cite Dr. Bolling's directive that Plaintiff "elevate [her] feet" (Tr. 266), that fact does not mean that the ALJ ignored such evidence. An ALJ need not reference every piece of evidence in the record. See, e.g., Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995). In addition, Dr. Bolling's one-time statement in November 2006 that Plaintiff should elevate her feet does not represent a medical opinion that Plaintiff must "prop her feet up for most of the day to alleviate the pain and collection of fluid in her legs," as Plaintiff claimed at her hearing. (Tr. 35, 42.)

The ALJ also considered Plaintiff's subjective complaints of venous insufficiency in formulating her RFC and resolving step five. First, the ALJ excluded jobs that would have required Plaintiff to spend extended time on her feet, by adopting an RFC of only sedentary work with "the option to sit or stand at will, specifically the option every 20-30 minutes to stand a few minutes before resuming seated position." (Tr. 16.) Second, the ALJ discussed Plaintiff's testimony that lower extremity swelling often required her to wear flip-flops or sandals and to prop her legs up during the day. (Tr. 17.) Third, at the hearing, the ALJ asked

13

the VE if having to wear flip-flops would impact the number of jobs available to Plaintiff and the VE testified it would not. (Tr. 61.) The ALJ also queried the VE about whether a need to elevate one's legs would limit the number of available jobs identified for Plaintiff. (Id.) The VE responded that requiring elevation below waist level would not impact that number, but that requiring elevation above heart level would reduce that number. (Id.)[8] The record thus confirms that the ALJ adequately addressed Plaintiff's reported symptoms from venous insufficiency both in determining the RFC and in soliciting from the VE an accounting of available jobs.

Given these considerations, any improper application of law at step two caused Plaintiff no prejudice and thus warrants no relief. See Oldham, 509 F.3d at 1256-57; Lewis, 498 F.3d at 911; Maziarz, 837 F.2d at 244; Lauver, 2010 WL 1404767, at *4; Washington, 698 F. Supp. 2d at 579-80; Jones, 2009 WL 455414, at *2.

## 2.    Symptom Reporting

Plaintiff next claims that, in formulating the RFC, the ALJ improperly evaluated Plaintiff's symptom reporting in light of the evidence. (Docket Entry 11 at 6-8.) Specifically, Plaintiff asserts that the ALJ "outright misstate[d] the record" regarding Plaintiff's treatment from October 2007 and December 2008, as well as at the Surry County Health and Nutrition Center in 2009 (id. at

---

[8] Dr. Bolling's directive that Plaintiff "elevate [her] feet" does not specify elevation above heart level throughout the work day. (Tr. 266.)

14

6) and distorted Plaintiff's description of her daily activities (<u>id.</u> at 7). Plaintiff further maintains that the ALJ erroneously discounted Plaintiff's account of her symptoms because she did not attempt to return to work until after settling her workers' compensation claim. (<u>Id.</u> at 8.) These arguments lack merit.

The Social Security Administration's <u>Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements</u>, SSR 96-7p, 1996 WL 374186, at *2, as applied by the Fourth Circuit in <u>Craig</u>, 76 F.3d at 594-95, provides a two-part test for evaluating a claimant's statements about symptoms. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" <u>Id.</u> at 594 (quoting 20 C.F.R. § 404.1529(b)). Upon satisfaction of part one, the analysis proceeds to part two, which requires an evaluation of the intensity and persistence of the claimant's symptoms, and the extent to which such symptoms affect his or her ability to work. <u>Id.</u> at 595. At that point, the fact finder:

> must take into account not only the claimant's statements about her pain, but also all the available evidence, including the claimant's medical history, medical signs, and laboratory findings, any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.), and any other evidence relevant to the severity of the

impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Id. (internal citations and quotation marks omitted).

Here, the ALJ ruled as to part one that Plaintiff had impairments that reasonably could have produced the alleged symptoms. (Tr. 18.) Regarding part two, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms not credible to the extent such statements reflected limitations greater than set forth in the RFC. (Id.) In making that finding, the ALJ thoroughly discussed, over a span of four and a half pages of single-spaced text, each of the above-discussed Craig factors. (See Tr. 18-23.)

As noted above, Plaintiff asserts that the ALJ "outright misstate[d] the record" by finding that Plaintiff's description of her back, leg, and knee pain lacked credibility in part because she did not complain of such pain at medical visits between October 2007 and December 2008. Plaintiff contends that she complained of low back pain at a doctor's visit in January of 2008, at which she received an epidural injection and that, "[r]ight before and right after this period . . ., [Plaintiff] had been in and out of her doctor's office with back pain and radiculopathy into her legs which Dr. [Bolling] attributed to 'severe' and 'advanced' degenerative sclerotic changes in her lumbar spine." (Docket Entry 11 at 6 (citing Tr. 260-62, 314, 315).)

The ALJ did not reversibly err in describing events between October 2007 and December 2008. As to the doctor's visit in January 2008 to which Plaintiff refers, the brief medical note indicates Plaintiff saw Dr. Richard W. Adams "for recheck and evaluation of low back pain and left knee pain." (Tr. 314.) Dr. Adams, however, listed no findings indicative of back, leg, or knee pain. (Id.) Although Dr. Adams injected Plaintiff's low back and prescribed pain medications, the note does not establish whether such treatments constituted responses to specific complaints by Plaintiff, part of a previously-planned course of treatment, or preventative measures. (Id.)[9] Further, as argued by Defendant (see Docket Entry 16 at 5 n.2), the fact that Plaintiff complained of such pain "[r]ight before and right after" the period in question (see Docket Entry 11 at 6) does not undermine the ALJ's observation that the record lacks evidence of such complaints between October 2007 and December 2008 (Tr. 19).

Plaintiff additionally faults the ALJ for describing her office visit with Dr. Logan in January 2009 as an "isolated occurrence" of declining function and an appointment intended for completing disability paperwork. (Docket Entry 11 at 6 (citing Tr. 19).) According to Plaintiff, the ALJ also erred by describing that visit as her last medical appointment. (Docket Entry 11 at 7

_____

[9] Notably, on February 25, 2009, Plaintiff reported that her lawyer previously had advised her to see a doctor every other month. (Tr. 338.)

(citing Tr. 19).)  Specifically, Plaintiff cites two visits to the Surry County Health and Nutrition Center in February and April 2009 (Tr. 337, 338), as evidence the ALJ "blatantly mischaracterized" Plaintiff's treatment history (Docket Entry 11 at 7).

Substantial evidence supports the ALJ's conclusion that Plaintiff's January 2009 visit with Dr. Logan represented an "isolated occurrence" of declining function.  (Tr. 19; <u>see also</u> Tr. 320.)  The ALJ correctly observed that treatment notes from the alleged onset date to December 2008, routinely showed Plaintiff "to have no motor, sensory or neurological deficits; to have negative straight leg raising; to be observed with no gait deficits; to have tenderness to palpation of only the low back sacroiliac areas and to be in no acute distress."  (Tr. 19; <u>see also</u> Tr. 243, 260, 261, 262, 264, 266, 267, 269-76, 315, 322.)  Further, the ALJ accurately stated that Dr. Logan's January 2009 report "contrast[ed] sharply" with those earlier findings, in that it reflected a "slow and limping gait . . . [,] decreased bilateral leg strength, positive straight leg raising bilaterally, tenderness to palpation of all levels of the lumbar spine and even lower thoracic spine as well as both lower legs."  (Tr. 19; <u>see also</u> Tr. 320.)

The ALJ did mistakenly recite that Plaintiff failed to seek medical treatment after January 2009 (Tr. 19), as Plaintiff did have appointments at the Surry County clinic in February and April 2009 (Tr. 337-38).  Moreover, although Dr. Logan completed a

18

disability assessment in conjunction with the January 2009 visit (Tr. 331-34), Plaintiff also complained of right leg pain and Dr. Logan performed a complete examination (Tr. 320). Any error as to these matters, however, qualifies as harmless.

First, the ALJ clearly considered Dr. Logan's findings in the January 2009 treatment note. (Tr. 19.) Second, the ALJ's decision states that Plaintiff's "decline in functioning is not evident before or after that January 2009 visit" and cites to Exhibits 15F, 16F and 18F. (Id. (emphasis added).) The first two pages of Exhibit 18F contain treatment notes from Plaintiff's February and April 2009 visits to the Surry County clinic. (Tr. 337-38.) These circumstances sufficiently indicate that the ALJ took note of later treatment, notwithstanding the conflicting language elsewhere in the language of the decision. Third, and most significantly, those treatment notes support the ALJ's statement that Plaintiff's apparent sharp decline in functioning did not manifest after the January 2009 appointment with Dr. Logan. (Id.)

On February 25, 2009, Plaintiff told the examining physician's assistant that, pursuant to her lawyer's advice, she needed to see a doctor every other month, which calls into question whether her symptoms or her ongoing disability claim led to the visit. (Tr. 338.) Examination of Plaintiff's right knee revealed some crepitus, but both knees otherwise tested within normal limits, including a full range of motion with no tenderness to palpation.

(Id.)  Plaintiff's back exhibited some tenderness to palpation at the sacroiliac joints bilaterally and from L4 to S1 but otherwise showed full range of motion, no spasm, and negative straight leg raise.  (Id.)  Plaintiff's hips functioned within normal limits. (Id.)  The physician's assistant recommended that Plaintiff continue "to get daily exercise and stretch," as well as to continue her current medications.  (Id.)  On April 3, 2009, a physician's assistant noted decreased strength in Plaintiff's lower extremities and that her right leg had minimal sensation and lagged behind when Plaintiff walked.  (Tr. 337.)  However, beyond injecting Plaintiff's joints, the physician's assistant did not prescribe any new medication, recommended Plaintiff increase her walking, and instructed Plaintiff to return to the clinic in two months.  (Id.)[10]  Because the findings from the foregoing clinic visits generally support the ALJ's overall credibility analysis, any failure to discuss them warrants no relief.  See Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

_____

[10] Plaintiff attempts to bolster the significance of the April 2009 visit by asserting that a physician's assistant noted "10/10 back pain when standing and 5/10 pain when sitting."  (Docket Entry 11 at 6.)  However, as argued by Defendant (see Docket Entry 15 at 5-6 n.3), the physician's assistant did not make that assessment, but rather merely recorded Plaintiff's report  (Tr. 337).

Next, Plaintiff alleges the ALJ improperly "paint[ed] a picture of [Plaintiff's] daily activities as [those] of a normal person with her doing all the cleaning and cooking in her house, taking care of personal needs with ease, walking around the neighborhood throughout the day and sleeping easy at night." (Docket Entry 11 at 7 (citing Tr. 21).) In regards to Plaintiff's daily activities, the ALJ found as follows:

> [Plaintiff's] daily activities are consistent with the above residual functional capacity assessment and are inconsistent with disabling levels of pain and depression alleged. [Plaintiff] lives alone, reports living independently with no particular assistance other than relying on her family to provide transportation for such things as grocery shopping and doctor's appointments. She testified she does her own house cleaning, dishes, meals, and personal care and she spends her day doing such things as walking around the neighborhood, doing word puzzles, and watching television.

(Tr. 21.) Plaintiff's testimony supports the foregoing description (see Tr. 32-34, 36, 50-51), as does the statement of Plaintiff's mother (Tr. 176-83). Although Plaintiff made other statements which suggest limitations (see, e.g., Tr. 184-91, 195-201), that fact does not render the ALJ's assessment reversible error.

Plaintiff also argues that the ALJ wrongly focused on the fact that Plaintiff attempted to return to work only after settling her workers' compensation claim. (Docket Entry 11 at 8.) On that subject, the ALJ stated as follows:

> [Plaintiff] testified she quit her long-time furniture assembler and sprayer job because of environmental restrictions from her doctor in March 2006, due to her

asthma symptoms at the time.  The medical records shortly thereafter show she reported to her doctor that being away from that environment improved her symptoms and the record shows she required no hospitalization or intensive treatment at that time or thereafter.  Thus, while she has other conditions, her statements and the record suggest[] her job loss was due only to her asthma. Despite her acknowledged improvement away from the former job environment, she testified [to] seeking no other employment until November 2006.  Giving consideration to the above discussion regarding the workers' compensation claim which was pending until the October 2006 hearing and settlement, this leads one to believe [Plaintiff] was not seeking work pending the outcome of her workers' compensation claim and not due to her medical conditions. This is consistent with the medical evidence during that period indicative of little to no change in her conditions.  Furthermore, in support of that belief is the fact she reports immediately seeking and obtaining work following that settlement, in November 2006. As for that work activity, the fact that she sought and obtained work suggests her symptoms and limitations were not of the severity as she has alleged in connection with this claim.  While such work lasted no more than one month, the record shows such work was beyond that which [Plaintiff] is found to have the residual functional capacity for in this decision, which as discussed above is for no more than sedentary work.   Furthermore, [Plaintiff] even testified that job required constant standing/walking on a concrete floor which aggravated her conditions requiring her to leave the job whereas her long-time furniture assembler/sprayer job involved padding and/or carpeted flooring underfoot resulting in no problems.

(Tr. 21-22.)

Cases exist that prohibit ALJs from considering <u>receipt</u> of workers' compensation benefits as a disincentive to work.  <u>See, e.g.</u>, <u>Hinton v. Massanari</u>, 13 F. App'x 819, 820 n.l (10th Cir. 2001) (finding "improper" ALJ's statement that claimant's receipt of workers' compensation benefits might "possibly have given

claimant less motivation to return to the work force" because
"Congress drafted the social security statutes with the expectation
that claimants could receive both workers' compensation and
disability benefits for on-the-job injuries"). Here, however, the
ALJ did not focus on the fact that Plaintiff received workers'
compensation benefits; rather, the ALJ took note of the
relationship between the timing of Plaintiff's receipt of benefits
and her first, post-alleged onset date attempt at work activity.

Under these circumstances, the ALJ's assessment of Plaintiff's
symptom reporting (and related record review) requires no relief.

## 3. Treating Physicians' Opinions

As a final matter, Plaintiff contends the ALJ improperly
evaluated the opinions of Drs. Bolling and Logan. (Docket Entry 11
at 8-10.) In particular, Plaintiff maintains the ALJ "completely
ignored" Dr. Bolling's view that Plaintiff must elevate her feet
and wrongly rejected Dr. Logan's prescribed limitations. (Id. at
8-9 (citing Tr. 266, 331-34).) Those contentions fail.

The treating physician rule generally requires an ALJ to give
controlling weight to the opinion of a treating source as to the
nature and severity of a claimant's impairment, on the ground that
treating sources "provide a detailed, longitudinal picture of [the
claimant's] medical impairment(s) [which] may bring a unique
perspective to the medical evidence that cannot be obtained from
the objective medical findings alone or from reports of individual

examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).[11] The rule also recognizes, however, that not all treating sources or treating source opinions deserve such deference.

First, the nature and extent of each treatment relationship may temper the weight afforded. 20 C.F.R. §§ 404.1527(d)(2)(ii) & 416.927(d)(2)(ii). Further, a treating source's opinion controls only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2)-(4) & 416.927(d)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590; accord Mastro, 270 F.3d at 178. Finally, opinions regarding issues reserved to the Commissioner, regardless of source, do not receive controlling weight. See 20 C.F.R. §§ 404.1527(e) & 416.927(e).

Plaintiff correctly asserts that the ALJ did not discuss Dr. Bolling's statement in November 2006 that Plaintiff should "elevate [her] feet." (Tr. 266.) However, under the relevant circumstances, this one-time directive does not amount to a medical opinion to which the ALJ had to consider deferring. The

---

[11] Effective March 26, 2012, a re-codification moved the treating physician rule to 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2), but without substantive change. See 77 Fed. Reg. 10651-10657 (Feb. 23, 2012). Given that all material events in this action preceded this non-substantive amendment, the undersigned will use the pre-March 26, 2012 citations.

regulations define "medical opinions" as "statements . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2). Dr. Bolling's cited statement occurred in November 2006, when Plaintiff experienced lower extremity swelling after performing a job that required her to stand on a concrete floor all day. (Tr. 266.) Dr. Bolling did not indicate how long each day Plaintiff would need to elevate her feet, how high she must elevate them, how long the need to elevate would last, or if it would apply regardless of the work environment. (Id.) In fact, although Dr. Bolling treated Plaintiff after November 2006, Dr. Bolling neither made further diagnoses of venous insufficiency nor imposed restrictions regarding elevation of Plaintiff's feet. (See Tr. 262-65, 324.) The record similarly lacks any reported functional assessment of Plaintiff's abilities to perform work-related activities by Dr. Bolling. Plaintiff has shown no error on point.

Nor did the ALJ improperly address Dr. Logan's "Medical Assessment of Ability to Do Work-Related Activities (Physical)" (Tr. 331-34). In that assessment, Dr. Logan opined that Plaintiff could not lift or carry more than 10 pounds, could never kneel, stoop, climb, crawl or balance, could not sit or stand for more than 30 minutes without interruption or more than one hour total in

25

a workday, and could not walk for more than 15 minutes at a time or for no more than 30 minutes total in a workday. (Id.) The ALJ evaluated Dr. Logan's opinion as follows:

> The[] restrictions expressed by Dr. Logan in January 2009 are given little evidentiary weight. First, [Plaintiff] testified she was only examined by Dr. Logan on this one occasion as she has primarily been under the care of the physician's assistant at the Surry County Health and Nutrition Center. Furthermore, Dr. Logan's treatment records make[] no indication she reviewed [Plaintiff's] problem list or medications but rather relied quite heavily on the subjective information provided by [Plaintiff]. The manipulative limitations Dr. Logan assessed because of [Plaintiff's] longstanding absence of her left index finger are inconsistent with [Plaintiff's] testimony and evidence of record. [Plaintiff] reports having loss of her left index finger for years, since 1983, and subsequently working many years as a furniture assembler/sprayer with no problems. She testified to no actual limitations as [a] result of the condition but that she gets along fine despite it. The fact that the impairment did not prevent [Plaintiff] from working or result in any work limitations prior to the alleged onset date strongly suggests that it would not currently prevent work or result in limitations. Furthermore, [Plaintiff] has more recently reported working as a packager in a meat processing plant with no limitations due to this condition. Moreover, the record shows she has lived independently for years and successfully maintained a household and personal care with no particular assistance which indicates good ability to handle, grip, manipulate small or large objects, grasp[], and otherwise use her left hand. The foregoing indicates [Plaintiff's] absence of her left index finger has resulted in no more than minimal limitations, if any. Dr. Logan also gave restrictions on walking and [Plaintiff's] use of her feet based on [Plaintiff] having periodic foot numbness, a symptom which appears to be based on [Plaintiff's] subjective complaint which is inconsistent with the objective evidence of record showing [Plaintiff] routinely found neurologically intact with no motor or sensory deficits. Of note, Dr. Logan indicates [Plaintiff] with need to alternate between sitting and standing, postural limitations, and

> environmental limitations which are somewhat consistent
> with the residual functional capacity conclusions reached
> in this decision.

(Tr. 22 (internal citation omitted).)

Plaintiff asserts, without citation to the record, that Dr. Logan "was familiar with [Plaintiff's] past medical history and was aware of Dr. [Bolling's] treatment regimen before she started treating [Plaintiff] directly." (Docket Entry 11 at 9.) The ALJ, however, correctly noted that Dr. Logan saw Plaintiff only on January 28, 2009, and that the record does not reflect that Dr. Logan reviewed Plaintiff's prior medical history. (Tr. 22, 320.) The ALJ thus permissibly discounted Dr. Logan's opinion as arising from a one-time examination of Plaintiff. See 20 C.F.R. §§ 404.1527(d)(2)(i) & 416.927(d)(2)(i) (indicating that, the more times a claimant sees a treating source, the more weight that source's opinion merits). Moreover, the ALJ did not err by noting that Dr. Logan's manipulative and walking limitations conflicted with other medical evidence and the record as a whole. (Tr. 22.) The record reflects that Plaintiff lost the index finger on her left, non-dominant hand in 1983, but thereafter worked in the furniture industry for over 20 years. (Tr. 53-54, 137-40, 214.) Further, no other physician noted any numbness in Plaintiff's feet or documented any related impairment.

In sum, the ALJ did not err by omitting a discussion of Dr. Bolling's directive or in evaluating Dr. Logan's opinion.

## CONCLUSION

Plaintiff has established no grounds for relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be granted and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 14, 2014